UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X
APPALSEED PRODUCTIONS, INC., d/b/a
APPALSONGS; CHARLES LLOYD,
INDIVIDUALLY, and d/b/a FOREST FARM
MUSIC; DARIUS BROOKS d/b/a FROM D'S PEN;
DAVID HOFFNER d/b/a FIELDS OF AUTUMN
PUBLISHING and HOFFNER HAUS MUSIC; JOE
HILL MUSIC, LLC, d/b/a JOE HILL MUSIC;
LAURENCE WEISS d/b/a RHINESTONE
COWBOY MUSIC CO.; MARK FARNER d/b/a
CRAM RENRAFF COMPANY; and R GANT
MUSIC GROUP, INCORPORATED, d/b/a HELLO
DARLIN' MUSIC,

    Plaintiffs,

    v.

MEDIANET DIGITAL, INC.; and
ALAN MCGLADE; and STEPHEN
BARRACLOUGH,

    Defendants.

------------------------------------- X

**DECLARATION OF STEPHEN E. GRAUBERGER ESQ.**

Case No. 11 Civ. 5922 (PGG)

Pursuant to 28 U.S.C. § 1746, I, STEPHEN E. GRAUBERGER, ESQ., hereby declare as follows:

    1.    I am a partner at Grauberger Green & Associates, PLLC, attorneys for the Plaintiffs, Appalseed Productions, Inc., *et al.* ("Plaintiffs" or "Appalseed") in the above captioned action. I submit this declaration in support of Plaintiffs' *Order to Show Cause for a Preliminary Injunction*, and to place the documents attached to this declaration before the Court.

    2.    I am an attorney in good standing admitted to practice in the state of Tennessee and, on March 8, 2012, I was admitted to appear before this Court in connection with this matter *pro hac vice*. I have been involved with Plaintiffs' representation throughout the pendency of this

action and throughout the pendency of a related case filed in the United States District Court for the Middle District of Tennessee, *MSC Music America, Inc., et al. v. Yahoo!, Inc., et al.*, 09-CV-0597, and therefore have personal knowledge of the record of this case, including all documents. I declare the facts herein based upon that personal knowledge.

3. The factual background of this dispute is set forth in the Complaint filed in this action on August 24, 2011 (the "Complaint"). A true and correct copy of the Complaint is attached hereto as Exhibit A.

4. Plaintiffs' sound recordings and musical compositions at issue in this case were all validly registered with the United States Copyright Office. True and correct copies of the copyright registrations for the works at issue are attached hereto as Exhibit B.

5. Defendant MediaNet Digital, Inc. ("MediaNet"), originally known as MusicNet, Inc., was founded by major recording labels in 1999 and became operational in 2001 as a service "that allows customers to add music and media content to their websites or applications easily and quickly. . . . handl[ing] complex tasks including licensing, royalty payments, reporting, encoding, and security so our customers can focus on their end-users." A true and correct copy of the "About Us" page from MediaNet's website is attached hereto as Exhibit C.

6. MediaNet makes its catalog of works available through digital transmission techniques, namely On-Demand Streams, generally defined as on-demand real time digital transmissions of sound recordings, and Limited Downloads, generally defined as the making and distribution of sound recordings by digital transmission to local storage devices. MediaNet transmits these to end users by copying content to its servers and then distributing such content through both its own online music subscription service, Performer Digital, and third-party end user services, such as iMesh, Inc. ("iMesh"), JRiver, Inc. ("JRiver"), JVL Corporation ("JVL"),

MOG, Inc. ("MOG"), and Synacor, Inc. ("Synacor"). For at least some of the preceding end user services, Performer Digital operates as a turnkey open platform, allowing the end user service to modify its appearance in conformity with their use in distributing to end users. True and correct copies of the Distribution Agreements for MediaNet's end user services and select portions from Mr. Alan McGlade's deposition testimony taken on March 15, 2012, are attached hereto as Exhibit D and Exhibit E, respectively.

7. Copyright law provides that "the exclusive rights provided by clauses (1) and (3) of section 106, to make and to distribute phonorecords of such works, are subject to compulsory licensing under the conditions specified by this section" and "any person who wishes to obtain a compulsory license under this section shall, before or within thirty days after making, and before distributing any phonorecords of the work, serve notice of intention to do so on the copyright owner." 17 U.S.C. § 115(b)(1). However, when enacted in 1995, this statute did not apply to digital transmission technologies that would dominate the future, primarily On-Demand Streams and Limited Downloads. True and correct copies of 17 U.S.C. §§ 106 and 115 as well as the CFR codification of 17 U.S.C. §115 are attached hereto as Exhibit F.

8. In September 2001, the Southern District of New York clarified the law regarding the scope of compulsory licenses for copyright-protected works in connection with On-Demand Streams and Limited Downloads through its decision in *Rogers and Hammerstein Organization v. UMG Recordings, Inc.*, 60 U.S.P.Q.2d 1354 (S.D.N.Y. 2001), which held that compulsory licenses for the "CD" recordings of the works did not cover any other configurations of the works. The Court further limited the reach of 17 U.S.C. § 115 by holding that recording labels could not obtain a compulsory license for On-Demand Streams at all, stating, "it appears that

even a compulsory license would not permit Defendants to stream these copyrighted works over the Internet." A true and correct copy of this decision is attached hereto as <u>Exhibit G</u>.

9. In the absence of established statutory royalty rates for On-Demand Streams, on or about October 5, 2001, the Recording Industry Association of America, Inc. ("RIAA"), representing recording labels, and the National Music Publishers' Association, Inc. ("NMPA"), representing music copyright owners through its licensing and royalty collections agency, The Harry Fox Agency ("HFA"), entered into an agreement whereby participating RIAA members were permitted to obtain from HFA represented publishers, of which Plaintiffs were not, a license to make On-Demand Streams and Limited Downloads available through digital music services, including MediaNet, in exchange for a one-time royalty payment of $1,000,000 and monthly advance payments of $62,500 to begin the following year, continuing until a permanent adjudication was made by the United States Copyright and Royalty Board (the "CRB"). A true and correct copy of this RIAA agreement with NMPA/HFA and a RIAA press release are attached hereto as <u>Exhibit H</u>.

10. On January 9, 2006, CRB announced the commencement of the Mechanical and Digital Phonorecord Delivery Rate Adjustment Proceeding (the "CRB DRAP") "to determine the reasonable rates and terms for making and distributing phonorecords," including new age distribution methods On-Demand Streaming and Limited Downloads, and encouraged interested parties to participate. True and correct copies of the CRB announcement and the CRB DRAP docket are attached hereto as <u>Exhibit I</u>.

11. On April 10, 2007, the Digital Media Association ("DiMA") and its member companies, including MediaNet, filed a Written Direct Statement for consideration in the CRB DRAP proceedings which proposed royalty rates for the 17 U.S.C. § 115 compulsory license and

went on to explain that, without royalty rates, the singular nature of the compulsory license made collecting the proper payments extremely cumbersome. A true and correct copy of the Written Direct Statement of DiMA is attached hereto as Exhibit J.

12. As part of the proceedings, MediaNet's former Chief Executive Officer, Alan McGlade, testified before the CRB DRAP in support of the proposals in DiMA's Written Direct Statement. Mr. McGlade explained MediaNet's efforts to secure mandatory compulsory licenses, stating "MusicNet also successfully directly licensed catalogs not represented by NMPA, such as Abko, Bug and Wixen, and continues to proactively pursue direct license agreements with the publishing community." A true and correct copy of Mr. McGlade's testimony is attached hereto as Exhibit K.

13. On September 22, 2008, RIAA and DiMA submitted a settlement agreement with proposed royalty rates for consideration in the CRB DRAP proceedings. On October 1, 2008, the CRB published the agreement in the Federal Register in 37 CFR Part 385 for comment and objection. Since none of the parties to the proceedings objected to the royalty rates set forth in the agreement, on November 24, 2008, pursuant to its mandate, the CRB adopted as law the terms of the agreement. True and correct copies of 37 CFR Part 385 and the ruling of the CRB are attached hereto as Exhibit L and Exhibit M, respectively.

14. On March 1, 2009, the ruling of the CRB became effective and licensees were ordered to begin paying royalties retroactively to licensors, according to the rates adopted by the CRB, which MediaNet apparently complied with for certain publishers. A true and correct copy of a royalty report from MRI to MediaNet is attached hereto as Exhibit N.

15. In April 2005 Baker Capital, a private equity firm that invests in global digital communications businesses, acquired 100% of MediaNet from its shareholders, namely major

recording labels. This acquisition disqualified MediaNet as a protected party under the NMPA/HFA agreement with RIAA, prohibiting it from exercising the licensing privileges granted under the agreement. A true and correct copy of select portions from Mr. Alan McGlade's deposition testimony taken on March 15, 2012, is attached hereto as Exhibit O.

16. Despite MediaNet's loss of licensing protection that had been available to it pursuant to the NMPA/HFA agreement with RIAA, MediaNet continued to distribute works owned by HFA represented publishers without obtaining licenses for such works. As a result of this activity, on February 13, 2008, HFA represented copyright owners filed a class action suit in this Court, *Sony/ATV Songs, et al. v. MusicNet, Inc. d/b/a MediaNet Digital*, 08-CV-01487, against MediaNet, alleging, among other things, copyright infringement for MediaNet's unlicensed distribution of their works. This matter was settled in May 2008. A true and correct copy of the class action complaint is attached hereto as Exhibit P.

17. On August 16, 2001, MediaNet entered into a Services Agreement with Music Reports Inc. ("MRI"), a licensing and royalty accounting firm, whereby, in exchange for payments of fees and out of pocket expenses, Music Reports Inc. provided to MediaNet voluntary and statutory licensing and royalty accounting services, including preparing, delivering, and resolving of the statutorily required Notices of Intent, that would allow MediaNet to avail itself of the compulsory license for the making and distribution of phonorecords pursuant to Section 115 of the Copyright Act. This service included identifying the individual tracks provided to MediaNet and taking various steps to match the tracks to their publishers in order to license the musical compositions prior to the launching of MediaNet's services. The scope of service was expanded in 2003 to include works already available in MediaNet's catalog which

were unmatched to a publisher. A true and correct copy of the Services Agreement is attached hereto as Exhibit Q.

18.   In 2002 and 2003, MediaNet sent purported "Notices of Intent" pursuant to 17 U.S.C. § 115 to some Plaintiffs in this matter for a small handful of the 327 works at issue, seeking compulsory licenses. These notices were facially defective and wholly ineffective for, among other defects, failing to: reference other entities who would utilize the music purportedly under notice; provide a telephone number of the licensee; state an expected distribution date; name the artist of the work being sought; specify a catalog number for the work; identify a label name; list a date of manufacture of the phonorecord; or sign the notice. A true and correct copy of the 2002 and 2003 Notices of Intent are attached hereto as Exhibit R.

19.   In November 2008 and July 2009, MediaNet again attempted to send Notices of Intent for some of the works at issue. Yet again, MediaNet failed to secure compulsory licenses for these works. Aside from being sent Notices of Intent after the works were copied and distributed (statutorily barring MediaNet from the ability to compulsory license those works), the Notices of Intent were once more facially deficient for, among other things, failing to identify the works' artists, catalog numbers, and label names. True and correct copies of the 2008 and 2009 Notices of Intent are attached hereto as Exhibit S.

20.   In 2009, MediaNet terminated its relationship with MRI and, on November 9, 2009, entered into a Digital Licensing Services Agreement with the licensing and royalty administration division of HFA, whereby HFA would secure the compulsory licenses for a subset of the works distributed in MediaNet's catalog in exchange for set fees paid by MediaNet. A true and correct copy of the Digital Licensing Services Agreement is attached hereto as Exhibit T.

21. According to sworn testimony in this matter, after HFA was retained to provide licensing services, MediaNet achieved "an overall match rate below 55%," leaving more than 45% of the works included in MediaNet's catalog unlicensed. Further sworn testimony revealed that to this day, 23% of MediaNet's catalog remains unlicensed. A true and correct copy of selections from Mr. Barraclough's deposition testimony is attached hereto as Exhibit U.

22. Screenshots taken from the websites of MediaNet third-party content distributors MOG and iMesh on March 18, 2012 evidence that 133 of Plaintiffs' protected songs were still included in MediaNet's catalog for On-Demand Streams and Limited Downloads. True and correct copies of the screen shots are attached hereto as Exhibit V.

23. Screenshots of MOG and iMesh's websites taken on March 22, 2012, after MediaNet's counsel confirmed the works at issue had been "deactivated" from MediaNet's catalog, revealed that many of Plaintiffs' protected songs were still included in MediaNet's catalog. In fact, additional songs belonging to Plaintiffs that were not listed in the Complaint were included in MediaNet's catalog, which evidences the ongoing and pervasive nature of this infringement. A true and correct copy of the screen shots are attached hereto as Exhibit W.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed the 30th Day of March, 2012.

Stephen E. Grauberger, Esq. (23652)