UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

APPALSEED PRODUCTIONS, INC. et al.,

                    Plaintiffs,

          - against -

MEDIANET DIGITAL, INC. et al.,

                    Defendants.

**MEMORANDUM
OPINION & ORDER**

11 Civ. 5922 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

          This is an action for copyright infringement brought by music publishers against MediaNet Digital, Inc., which offers musical recordings for digital download and streaming.[1] Pending before the Court is Plaintiffs' motion for a preliminary injunction. For the reasons stated below, Plaintiffs' motion will be denied.

## BACKGROUND

          Plaintiffs own the copyrights to the approximately 230 musical compositions listed in the Complaint. These musical works have been registered with the United States Copyright Office. (Cmplt. ¶¶ 30-32, 34-36, 38-40, 42-44, 46-48, 50-52, 54-56, 58-60, 62-64) The gist of Plaintiffs' lawsuit is that Defendants have made available Plaintiffs' compositions for digital download and streaming without having obtained the necessary licenses.

## I.   THE NATURE OF MEDIANET'S BUSINESS

          Pursuant to agreements with record labels, Defendant MediaNet offers a catalog of more than 15 million musical recordings to third-party Internet music services ("third-party

---

[1] Also named as defendants are Alan McGlade and Stephen Barraclough. They are, respectively, the former and current chief executive officer of MediaNet. (Cmplt. ¶¶ 12-13; Am. Answer ¶¶ 12-13)

services"), including iMesh, Inc., JRiver, Inc., JVL Corporation, MOG, Inc., and Synacor, Inc. (Apr. 9, 2012 Goldstein Decl. ¶ 2; Apr. 9, 2012 Mann Decl. ¶ 2; Mar. 30, 2012 Grauberger Decl. ¶ 6)  MediaNet offers a "business-to-business technology platform that enables third-party Internet music services to provide digital music to consumers through digital downloads, subscription, or streaming services."  (Apr. 9, 2012 Goldstein Decl. ¶ 2; see also Cmplt. ¶¶ 16-17)  MediaNet does not provide music to consumers directly.[2]  (Apr. 18, 2012 Tr. 22-23; Mar. 27, 2012 Wallace Decl. ¶ 2)

The full digital downloads of sound recordings offered by third-party services working in conjunction with MediaNet are not at issue in this case.  (Apr. 18, 2012 Tr. 21) Instead, it is the "on-demand streaming" and "limited downloads" – services offered by subscription – that are in dispute.  (Apr. 9, 2012 Goldstein Decl. ¶¶ 11-14; Cmplt. ¶¶ 33, 37, 41, 45, 49, 53, 57, 61, 65)  A "limited download" allows a consumer to download a copy of a sound recording, store the recording in his or her hard drive, and play the recording so long as the consumer subscribes to the service.  (Apr. 9, 2012 Goldstein Decl. ¶¶ 11-14; see also Mar. 30, 2012 Grauberger Decl. ¶ 6)  Once the consumer's subscription ends, he or she will no longer be permitted to play the recording.  (Apr. 9, 2012 Goldstein Decl. ¶¶ 11-14)  "On-demand streaming" refers to a process by which a consumer selects a song to be played for immediate use, through streaming over the Internet.  (Id. ¶ 13; Mar. 30, 2012 Grauberger Decl. ¶ 6) Although the consumer may listen to the sound recording as it is streamed, no permanent copy of the recording is made.  (Id.)

---

[2]  Although the Complaint asserts that MediaNet provides music directly to customers through its own subscription music service (Cmplt. ¶¶ 18-20), MediaNet's counsel has represented that MediaNet does not have "any direct consumer facing service.  They only operate through third party services."  (Apr. 18, 2012 Tr. 23; see also Mar. 27, 2012 Wallace Decl. ¶ 2)  Plaintiffs have not disputed this assertion.

MediaNet's agreements with record labels address the method by which the record labels' digital music tracks are delivered to MediaNet's servers – a process referred to as "ingestion." (Mar. 27, 2012 Wallace Decl. ¶ 4)  MediaNet is required to comply with the record labels' ingestion requirements and cannot alter the ingestion process.  (Id.)  During the ingestion process, the record labels deliver "metadata," which includes "identifying information about the delivered digital music track[,] such as a numerical identifier, the track's name, the track's album's name, the performing artist, and the date the track was released" (id. ¶¶ 10-11), as well as "fields that indicate what sort of delivery methods MediaNet is permitted by the record labels to use with the track, such as whether the track may be streamed or downloaded." (Id. ¶ 12)  The record labels use this ingestion process on a regular basis to add new digital music tracks to MediaNet's servers and/or to refresh the tracks' metadata.  (Id. ¶ 14)  More than 100,000 new tracks are "ingested" each week by MediaNet.  (July 3, 2012 Charap Decl. ¶ 9)

## II.    LICENSING OBLIGATIONS

In order to lawfully distribute digital music over the Internet, MediaNet must obtain various licenses.  (Apr. 9, 2012 Goldstein Decl. ¶ 4; Cmplt. ¶ 24)  For example, licenses must be obtained from the record labels to play, reproduce, and distribute sound recordings. (Apr. 9, 2012 Goldstein Decl. ¶ 4)  Where the record labels do not own the musical compositions embodied in their sound recordings, a company wishing to distribute these recordings digitally must also obtain rights to play and reproduce the underlying musical compositions from the copyright owners of those compositions.  (Id.)  The right to play the musical composition is referred to as the "public performance right," while the right to reproduce and distribute musical compositions embodied in sound recordings is commonly referred to as the "mechanical right." (Id. ¶ 5)  It is the "mechanical right" in the musical works listed in the Complaint that is at issue

3

here.  (Id. ¶ 6)  More specifically, it is the copyright holders' mechanical rights in "limited downloads" and "on-demand streams" of the musical compositions embodied in sound recordings referenced in the Complaint that are at issue.  Permission to reproduce and distribute copyrighted works in these formats may be obtained by voluntary license – i.e., with the consent of the copyright holder – or by compulsory license, pursuant to 17 U.S.C. § 115.[3]  (Cmplt. ¶ 27)

Section 115 of the Copyright Act permits companies such as MediaNet to obtain compulsory licenses from copyright holders to reproduce and distribute copies of sound recordings at a statutory rate, adjusted over time.  (Id. ¶ 7; 17 U.S.C. § 115)  In 2002, MediaNet began sending Notices of Intent to Obtain a Compulsory License ("NOIs") to music publishers, including certain of the Plaintiffs, concerning a number of the compositions at issue.  (Id. ¶¶ 20-21)  MediaNet sent additional NOIs to certain Plaintiffs in 2003, 2008, 2009, and 2010.  (Id. ¶¶ 20-22)  On November 15, 2008, MediaNet sent NOIs to Plaintiffs Appalsongs and Cram Renraff, and to MCS, then copyright administrator for all Plaintiffs except Appalsongs.  (Id. ¶ 22)  These NOIs covered 170 of the compositions listed in the Complaint.  On November 19, 2008, MCS sent MRI an email acknowledging receipt of the NOIs and stating that MCS would "be happy to issue a license." [4]  (Id. ¶ 22, Ex. A)  MediaNet alleges that, in total, it has sent NOIs

---

[3]  Although Plaintiffs plead in the Complaint that permission to distribute copyrighted works by "on-demand streams" or "limited downloads" may be obtained either through voluntary license or compulsory license (Cmplt. ¶ 27), in later submissions, they contend that "'a compulsory license would not permit Defendants to stream these copyrighted works over the Internet.'" (Mar. 30, 2012 Grauberger Decl. ¶ 8 (quoting Rogers and Hammerstein Organization v. UMG Recordings, Inc., 60 U.S.P.Q. 2d 1354, 1360 (S.D.N.Y. 2001)); see also Pltf. Moving Br. 4) Because this issue is not material to resolving Plaintiffs' preliminary injunction motion – which, as explained below, founders on the irreparable injury element – it is unnecessary to address it further.

[4]  Plaintiffs nonetheless contend that the NOIs were facially defective for a variety of reasons and accordingly are "wholly ineffective as proper notice of intent to procure a compulsory license for MediaNet Digital, Inc."  (Apr. 12, 2012 Grauberger Decl. ¶ 32; Mar. 30, 2012 Grauberger Decl. ¶¶ 18-19)

to Plaintiffs or Plaintiffs' copyright administrators covering all but approximately 20 of the 230 compositions listed in the Complaint.[5]  (Id. ¶ 24)

Plaintiffs claim, however, that they first learned of MediaNet's use of their musical compositions on October 8, 2009, when MediaNet's then general counsel participated in an unsuccessful mediation of a case brought by Plaintiffs in the Middle District of Tennessee against Yahoo!, Inc., RealNetworks, Inc., and Microsoft Corporation.  MSC Music America, Inc., et al. v. Yahoo! Inc., et al., No. 09-CV-0597 (the "Yahoo Case"); see Apr. 12, 2012 Grauberger Decl. ¶¶ 2, 7.  In that case, Plaintiffs alleged that the defendants, which operated internet music subscription and non-subscription services, had without permission "copied, displayed, performed and distributed to the public, via [their] 'On-Demand Streams' and 'Limited Downloads'" sound recordings embodying Plaintiffs' copyrighted musical compositions.  (See No. 09-CV-0597, Dkt. No. 1 at ¶¶ 28-30, 34-36, 40-42, 46-48, 52-54, 58-60, 64-66, 70-72, 76-78, 82-84, 88-90, 94-96, 100-102)  The Yahoo Case was resolved in October 2010 through a confidential settlement agreement entered into by Plaintiffs, Microsoft, Yahoo!, and MediaNet.[6]  (Apr. 12, 2012 Grauberger Decl. ¶ 36; No. 09-CV-0597, Dkt. No. 176)  Although MediaNet was not a party to the Yahoo Case, it was a party to the settlement agreement, apparently in its capacity as indemnitor.  (Apr. 18, 2012 Tr. 28, 35, 75; May 7, 2012 Tr. 35)

---

[5] In 2009 – after the Copyright Royalty Board finalized royalty rates for mechanical licenses for limited downloads and on-demand streams – MediaNet sent checks to MCS for all retroactive mechanical royalties due to Plaintiffs Joe Hill, From D's Pen, Hoffner Haus, and Forest Farm; these plaintiffs cashed the royalty checks.  (Id. ¶ 25)  In 2011, MediaNet sent royalty checks to many of the Plaintiffs for compositions at issue in this litigation and at least two Plaintiffs – Darius Brooks and Laurence Weiss – cashed those checks.  (Id. ¶ 26)
[6] Plaintiffs' claims against RealNetworks, Inc. were dismissed pursuant to a stipulation.  (No. 09-CV-0597, Dkt. No. 74)

On August 24, 2011, Plaintiffs filed the instant suit alleging that MediaNet and its present and former CEO had engaged in copyright infringement, contributory copyright infringement, and vicarious copyright infringement under the Copyright Act, 17 U.S.C. § 101 et seq. (Cmplt. ¶¶ 80-106)  Plaintiffs allege, inter alia, that without their authorization or permission, Defendants have "copied, displayed, performed and distributed to their customers . . . [sound recordings embodying Plaintiff's copyrighted musical works] via 'On-Demand Streams' and 'Limited Downloads' through . . . their customers' music services."  (Id. ¶¶ 33, 37, 41, 45, 49, 53, 57, 61, 65)  The Complaint further alleges that "Defendants did not seek or obtain permission or authorization from Plaintiffs prior to copying Plaintiffs' copyrighted works onto MediaNet's music service and distributing said works through its customers and ultimately to the general public."  (Id. ¶ 66)

III.     **PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiffs claim that they recently learned of flaws in Defendants' automated "ingestion" process – the mechanism by which record labels regularly add new digital music tracks to MediaNet's servers (Cmplt. ¶ 14) – that have caused Defendants to routinely make available for streaming or download tracks for which they have no license.  (Mar. 30, 2012 Higgins Decl. ¶ 6; Pltf. Moving Br. 6; Apr. 18, 2012 Tr. 72; May 7, 2012 Tr. 34-37)

On March 19, 2012, Plaintiffs' counsel informed defense counsel that certain of the compositions at issue in this litigation remained accessible to consumers on one or more of the third-party services.  (Mar. 30, 2012 Higgins Decl. ¶ 5; Apr. 9, 2012 Roman Decl. ¶ 2)  Defense counsel advised Plaintiffs that MediaNet had previously taken steps designed to deny end-users of the third-party services access to the compositions at issue, but that access to the disputed tracks was inadvertently reactivated during the ingestion process, as a result of metadata

6

submitted to MediaNet by the record labels.  (Mar. 30, 2012 Higgins Decl. ¶ 6)  In response to

Plaintiffs' counsel's complaint, defense counsel advised that on March 19, 2012, "all of the

songs at issue [in this litigation] were manually removed from MediaNet's catalog," and that by

March 20, 2012, "computerized measures [have] been put into place by MediaNet to ensure that

metadata updates delivered by the record labels will not inadvertently reactivate the songs at

issue in this suit."  (Mar. 30, 2012 Higgins Decl. ¶ 6, Ex. C)

On April 2, 2012, Plaintiffs nonetheless moved by order to show cause for a

preliminary injunction enjoining Defendants from:

1. Using an automated process which adds content to the MediaNet catalog
   automatically, irrespective of whether that content is properly licensed in
   accordance with copyright law, and immediately distributing that catalog to its
   customers, until such time as it has ceased utilizing the infringing, automated
   process and can satisfactorily demonstrate to the Court that such automated
   process has been ceased and that it is no longer engaging in infringement of
   copyrighted works, including Plaintiffs' copyrighted works;

2. Distributing the MediaNet catalog to its customers, including third party
   music services, until it can satisfactorily demonstrate to the Court that the
   infringing automated process has been ceased and that it is no longer engaging
   in infringement of copyrighted works, including Plaintiffs' copyrighted works
   . . . .

(Dkt. No. 26)

### A.    Defendants' Efforts to Block Access to Plaintiffs' Compositions

On April 18, 2012, and May 7, 2012, the Court conducted hearings on Plaintiffs'

application for a preliminary injunction.  At these hearings, and in pre- and post-hearing

submissions, the parties disputed whether sound recordings embodying Plaintiffs' compositions

continue to be accessible to consumers through MediaNet's third-party Internet music service

clients.  (Apr. 18, 2012 Tr. 4-5, 32, 38-43)  These disputes have continued to the present day.

(See July 2, 2012 Higgins Decl.; July 3, 2012 Charap Decl.)  The Court's consideration of this

issue has been hampered by misrepresentations, on Plaintiffs' part, concerning the magnitude and nature of the problem, and on Defendants' part, concerning the efficacy of their remedy.

As discussed above, on March 20, 2012, Defendants gave assurances to Plaintiffs that "computerized measures [have] been put into place by MediaNet to ensure that metadata updates delivered by the record labels will not inadvertently reactivate the songs at issue in this suit." (Mar. 30, 2012 Higgins Decl. ¶ 6, Ex. C)

In preparation for the April 18, 2012 hearing, Defendants made similar representations to the Court.  For example, in an April 9, 2012 declaration, Brian Mann, Technical Content Manager at MediaNet, stated that in August 2011, after the instant suit was filed, MediaNet's "Content Operations team" "revoke[d] the access rights to the sound recordings that were specifically identified in the complaint in this action . . . , thereby denying access to the disputed tracks to end users on MediaNet's customers' services (e.g., iMesh, Synacore, MOG, J River, JVL and Curatel. . . .).  Each of these disputed tracks was marked with a data flag that indicated that the access rights to the track had been revoked."  (Apr. 9, 2012 Mann Decl. ¶ 2)

After Plaintiffs' counsel's March 19, 2012 complaint, MediaNet's Content Operations team "discovered that many of the disputed tracks were . . . once again accessible to end users of MediaNet's customers' services, despite the fact that rights to access those tracks had previously been revoked."[7]  (Id. ¶ 3)  On March 20, 2012, MediaNet "put into place a

_____

[7]  Mann explained that this inadvertent reactivation occurred in one of two ways:

> The first is when MediaNet receives and applies an update to the . . . metadata for that track sent to it by the record label.  In this case, the data flag that has originally been applied to the disputed track indicating that rights to that track had been revoked would have been overwritten, which would have reactivated access to the disputed track.

procedure that ensured that access to all of the disputed tracks were again blocked. . . ."  (Id. ¶¶ 1, 3, 7)  MediaNet implemented "a process to ensure that the disputed tracks, and even tracks that were not identified in the Complaint but that embody compositions listed in the Complaint, are blocked and will remain blocked regardless of what happens during MediaNet's content ingestion process."  (Id. ¶ 7) (emphasis added).  MediaNet's Content Operations team

> now searches for tracks with titles that are the same as those of the disputed tracks.  The Content Operations team then manually inspects the titles and for each disputed track found (i) revokes rights to the disputed track using the same method described previously that was used in August 2010, and in addition (ii) blocks the disputed track from being published on MediaNet's catalog as it appears to users of MediaNet's customers' services.  As per this new procedure, as of April 4, 2012, it is no longer possible for an end user to obtain a new limited download of, or to play a stream of, any of the disputed tracks.  There should also be no way for access to the disputed tracks to be re-activated.

(Id. ¶ 8) (emphasis added).

At the April 18, 2012 hearing, however, Plaintiffs' counsel represented that he was still able to access certain of the compositions at issue from MOG and iMesh's websites, indicating – according to Plaintiffs' counsel – that Plaintiffs' songs were still included in MediaNet's catalog.  (Apr. 18, 2012 Tr. 38-41, 50-52; see also Mar. 30, 2012 Grauberger Decl. ¶ 23)

---

> The second is where a disputed track is submitted to MediaNet by a different distributor than the original, which would cause the disputed track to be ingested into MediaNet's system as "new" content.  In this case, there would be no change to the data flag that had been applied to the original disputed track, but a "new" track – effectively, a duplicate of the original – would be inserted into MediaNet's catalog for which rights had never been revoked to begin with.

(Id. ¶¶ 5-6)

Because of this factual dispute, this Court ordered the parties to submit supplemental declarations concerning the current availability of Plaintiffs' musical works on third-party services associated with MediaNet.  (Dkt. No. 60; Apr. 18, 2012 Tr. 58-66)

Plaintiffs' counsel submitted a supplemental declaration asserting that, between April 19, 2012, and April 23, 2012, he was able to download from iMesh and play numerous recordings embodying compositions at issue in this case.  Indeed, Plaintiffs' counsel submitted screenshots of himself downloading and playing these compositions.  (Apr. 24, 2012 Grauberger Decl. ¶¶ 5-8, Ex. B, C).  However, Defendants offered evidence that none of the recordings counsel downloaded and played on iMesh came from MediaNet's servers; instead, the recordings came from the hard drives of other iMesh users through iMesh's peer-to-peer service.[8]  (May 2, 2012 Wallace Decl. ¶¶ 9-13)  Plaintiffs' counsel's assertions that MediaNet was also making their compositions available to other Internet music services, such as Kazaa and Microsoft Zune, were also demonstrated to be false.[9]

It is, however, equally clear that Defendants' system for blocking access to Plaintiffs' compositions is – contrary to Defendants' representations in March and early April – not foolproof.  For example, Defendants admit that in conducting searches of third-party

---

[8]  iMesh offers two different services:  a free peer-to-peer service, through which music files are provided by iMesh users to other iMesh users, and a "premium" service, which requires payment of a monthly subscription fee and through which customers access music from MediaNet's catalog.  (May 2, 2012 Wallace Decl. ¶ 11)  Defendants explain that Plaintiffs' counsel's screenshots show that each of the files he downloaded and played is marked with a green circular icon, which indicates that the tracks were provided by iMesh users rather than MediaNet's servers.  (Id. ¶¶ 12-13)

[9]  Plaintiffs' counsel asserted that he was able to download and stream more than 250 recordings embodying Plaintiffs' compositions from Kazaa, another Internet music service.  (Apr. 24, 2012 Grauberger Decl. ¶ 12)  MediaNet does not distribute content to customers of Kazaa, however.  (May 2, 2012 Goldstein Decl. ¶ 14)  Plaintiffs were likewise able to download and stream Plaintiffs' compositions from Microsoft Zune (Apr. 27, 2012 Higgins Decl. ¶ 11), but MediaNet does not provide end users of Microsoft Zune's service with streams or limited downloads of any tracks in MediaNet's catalog.  (May 2, 2012 Wallace Decl. ¶ 3)

services' databases pursuant to the Court's April 23, 2012 order (Dkt. No. 60), they found six of

Plaintiffs' compositions; Defendants "immediately blocked access to these tracks in their

catalog." (Apr. 27, 2012 Roman Decl. ¶¶ 4-7)  Defendants attributed the presence of these

compositions in their database to, inter alia, different spellings and parentheticals in the track

titles. (Id. ¶¶ 5, 6)  Defendants represented that searches conducted between April 27 and May 7,

2012, revealed that none of the compositions listed in the Complaint were contained in

Defendants' catalog.[10]  (Id. ¶ 7; May 7, 2012 Tr. 13-14)

---

[10]  On April 27, 2012, MediaNet submitted a declaration stating that it had implemented a four-step procedure designed to block access to Plaintiffs' compositions:

> The first step in the blocking procedure is a "manual search" of MediaNet's catalog for track titles that exactly match, or are similar to, the titles of the compositions at issue. These searches are "manual" in the sense that they currently must be initiated and performed by an individual person, as opposed to an "automated" search, which would be one that is initiated and performed by a computer program.

> . . . The second step in the blocking procedure is the removal of download and streaming permissions from the metadata associated with the file. As was previously described, the record labels provide MediaNet with metadata corresponding to the digital musical tracks that they deliver to MediaNet during the ingestion process. One field in this metadata is a permissions field which, when active, allows MediaNet's servers to stream or provide limited downloads of the particular digital music track associated with that metadata. When the permission flag is removed from a particular track's metadata, the track can no longer be streamed or downloaded from MediaNet's servers. MediaNet removes this permissions flag from every digital music track that it identifies during the manual search procedure.

> . . . The third step in the blocking procedure is adding to a "blacklist" the numerical track identifier ("track id") for each track to be blocked. . . . Once a track id is placed on the blacklist, the associated digital music file is effectively invisible to MediaNet's customers. This track id blacklist functions separate and apart from the permissions flag in the metadata, and is not part of the metadata of any of the tracks being blocked. No metadata refresh can affect it, which eliminates the issue of the ingestion process reinstating permissions for digital music tracks whose permission flags were previously removed. . . .

There have, however, been additional, albeit isolated, incidents of Plaintiffs'
compositions becoming accessible in MediaNet's catalog since May 7, 2012.  For example, at a
June 29, 2012 conference in this matter, and in a July 3, 2012 declaration, Defendants' counsel
conceded that eleven "tracks embodying compositions at issue had slipped through MediaNet's
automated blocking procedures."  (July 3, 2012 Charap Decl. ¶¶ 3, 12)  The tracks were quickly
removed, and "no subscriber to any of MediaNet's customers accessed these 11 tracks while they
were available."  (Id. ¶¶ 6, 12)  Defense counsel attributes the "recent slip-up" to the fact that "an
employee responsible for the blacklist was out sick on [ ] Sunday.  As a result[,] the application
of the blacklist to ingested material was delayed and the offending tracks were published."  (Id. ¶
9)  Defense counsel further represents that, "[t]o avoid this in the future, MediaNet has already
implemented new procedures[,] including a post-ingestion sweep of material ingested within the
last 24 hours and the hiring of an individual devoted to manually search all ingested material for
the compositions at issue."  (Id. ¶ 10)

Given the repeated instances of Plaintiffs' compositions becoming available
through Defendants' catalog, and given defense counsel's observation that "the automatic
blocking procedure is new, and like any other software, bugs and defects are discovered as the
procedure is used in operation" (id., ¶ 11), the Court finds that it is likely that there will be at

---

As an additional layer of protection, MediaNet is taking a fourth step in the
blocking procedure and renaming the files of the digital music tracks identified in
the manual search procedure.  In this step, the filename of the file of any digital
music track on the track id blacklist is altered so that it cannot be found by any of
MediaNet's customer services.  The result is that an end user of one of
MediaNet's customers' digital music services will not be able to play or stream
any track by title that has been included in the track id blacklist.

(Apr. 27, 2012 Goldstein Decl. ¶¶ 4-9)  In addition, MediaNet represented on April 27, 2012,
that it was developing an automated blocking procedure to replace the manual searches.  (Id.
¶ 12)

least isolated instances of Plaintiffs' compositions becoming available through Defendants' catalog as this litigation proceeds.

### B. Defendants' Tracking of Plays

Pursuant to its agreements with the record labels, MediaNet is "contractually obligated to keep track of, and to provide the record labels with monthly reports of, data concerning what use has been made of every digital music track in MediaNet's catalog," including the number of times a track has been played.  (Mar. 27, 2012 Wallace Decl. ¶¶ 21-22) Since 2001, MediaNet has utilized "a computerized royalty tracking system that tracks, records, and stores this . . . data."  (Id. ¶ 23)  "[E]ach time an end-user of one of MediaNet's customers asks to play a limited download or stream of a track in MediaNet's catalog, MediaNet records the name of the artist for the track requested, the track name and its unique numerical identifier, the album name and its unique numerical identifier, and whether the play was of a limited download or a stream."  (Id.)  In order to ensure that MediaNet is complying with its contractual royalty obligations, the record labels have reviewed and approved the system used by MediaNet and have conducted random audits to confirm its accuracy.  (Id.)  MediaNet has all usage data for the compositions at issue from August 2008 to the present.[11]  (Id. ¶ 24)

---

[11]  Plaintiffs have questioned the efficacy of MediaNet's tracking system based on discovery obtained during the Yahoo Case.  (See Apr. 24, 2012 Grauberger Decl. ¶ 13)  For example, Plaintiffs claim that although Defendants asserted during the Yahoo Case that recordings of the composition "Creepin'" had been played and/or downloaded less than 500 times, the Microsoft Zune service showed that three recordings of "Creepin'" had been played more than 52,000 times.  (Id. ¶ 13)  Defendants explain, however, that "[t]he play count displayed on the Zune website (back when MediaNet provided content to Zune users) was not an accurate count of the number of actual plays of tracks from MediaNet's service.  Rather, the Zune website's play count includes an aggregate of many different types of plays in addition to limited downloads and streams from the Zune and Zune Pass subscription services, including (1) plays of tracks purchased via permanent downloads; (2) plays of tracks ripped from CDs by Zune users; and (3) aggregate plays of tracks on multiple devices by the same user."  (May 2, 2012 Wallace Decl. ¶ 20)  Accordingly, the play count displayed on the Zune website did not provide an accurate

## DISCUSSION

Plaintiffs' core argument for injunctive relief is that Defendants' automatic ingestion process makes future episodes of infringement not just possible, but likely.  While a likelihood of continued infringement is a necessary prerequisite for the issuance of a preliminary injunction here, see Life Tech. Corp. v. AB Sciex Pte. Ltd., No. 11 Civ. 325(RJH), 2011 WL 1419612, at *4 (S.D.N.Y. Apr. 11, 2011) ("'[A] party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.'") (quoting Kammerling v. Massanari, 295 F.3d 206, 214 (2d Cir. 2002)); Pan Am. World Airways v. Flight 001, Inc., No. 06 Civ. 14442(CSH), 2007 WL 2040588, at *6 (S.D.N.Y. July 13, 2007) ("Although trademark infringement can cause irreparable harm, plaintiff must still show a sufficient likelihood that the infringing conduct will occur in the near future so as to justify a preliminary injunction."); see also 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 14.06[B][1][a] (Matthew Bender, rev. ed. 2011) ("injunctive relief ordinarily is not granted absent any threat of continuing or additional infringements"), it is not sufficient in itself to justify such relief.  Plaintiffs must also demonstrate irreparable harm.  Because they have not done so, their application must be denied.

## I.    PRELIMINARY INJUNCTION STANDARD

In Salinger v. Colting, 607 F.3d 68 (2d Cir. 2010), the Second Circuit applied the preliminary injunction standard set forth in eBay v. MercExchange, L.L.C., 547 U.S. 388, 390 (2006), in the copyright context.  In doing so, the court stated that "eBay strongly indicates that the traditional principles of equity it employed are the presumptive standard for injunctions in

---

count of plays of limited downloads or streams from MediaNet's catalog.  In sum, Plaintiffs have not offered any credible evidence that MediaNet's tracking system is unreliable.

any context," and that "we see no reason that <u>eBay</u> would not apply with equal force to an injunction in <u>any</u> type of case." <u>Salinger</u>, 607 F.3d at 78, 78 n.7 (emphasis in original). Accordingly, this Court will apply the <u>eBay</u> standard here.

A district court must consider the following factors in determining whether to grant a preliminary injunction:

> First . . . a court may issue a preliminary injunction . . . only if the plaintiff has demonstrated "either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the [plaintiff]'s favor." Second, the court may issue the injunction only if the plaintiff has demonstrated "that he is likely to suffer irreparable injury in the absence of an injunction." The court must not adopt a "categorical" or "general" rule or presume that the plaintiff will suffer irreparable harm (unless such a departure from the long tradition of equity practice was intended by Congress). Instead, the court must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the "remedies available at law, such as monetary damages, are inadequate to compensate for that injury." Third, a court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor. Finally, the court must ensure that the "public interest would not be disserved" by the issuance of an injunction.

<u>Salinger</u>, 607 F.3d at 79-80 (internal citations omitted).

"A preliminary injunction is an 'extraordinary remedy that should not be routinely granted.'" <u>New Look Party Ltd. v. Louise Paris Ltd.</u>, No. 11 Civ. 6433(NRB), 2012 WL 251976, at *2 (S.D.N.Y. Jan. 11, 2012) (quoting <u>Procter & Gamble Co. v. Ultreo, Inc.</u>, 574 F. Supp. 2d 339, 344 (S.D.N.Y. 2008)). "The party seeking the injunction carries the burden of persuasion to demonstrate, 'by a clear showing,' that the necessary elements are satisfied." <u>Reckitt Benckiser Inc. v. Motomco Ltd.</u>, 760 F. Supp. 2d 446, 452 (S.D.N.Y. 2011) (quoting <u>Mazurek v. Armstrong</u>, 520 U.S. 968, 972 (1997)).

**II.**     <u>**PLAINTIFFS HAVE NOT SHOWN IRREPARABLE HARM**</u>

Under the <u>Salinger</u> standard, the court "must not adopt a 'categorical' or 'general' rule or presume that the plaintiff will suffer irreparable harm (unless such a 'departure from the long tradition of equity practice' was intended by Congress)." <u>Salinger</u>, 607 F.3d at 80 (quoting <u>Winter v. Natural Resources Defense Council</u>, 555 U.S. 7 (2008); <u>eBay</u>, 547 U.S. at 391 (2006)). Instead, "plaintiffs must show that, on the facts of their case, the failure to issue an injunction would actually cause irreparable harm." <u>Id.</u> at 82.

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" <u>Faiveley Trans. Malmo AB v. Wabtec Corp.</u>, 559 F.3d 110, 118 (2d Cir. 2009) (quoting <u>Rodriguez v. DeBuono</u>, 175 F.3d 227, 234 (2d Cir. 1999)). "Because of this, 'the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.'" <u>Reckitt</u>, 760 F. Supp. 2d at 453 (quoting <u>Rodriguez</u>, 175 F.3d at 234). "If the movant fails to make a showing of irreparable harm, the motion for a preliminary injunction must fail." <u>Id.</u>

"To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a court waits until the end of trial to resolve the harm.'" <u>Freedom Holdings, Inc. v. Spitzer</u>, 408 F.3d 112, 114 (2d Cir. 2005) (quoting <u>Rodriguez</u>, 175 F.3d at 233-34). "'Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances.'" <u>Faiveley</u>, 559 F.3d at 118 (quoting <u>Moore v. Consol. Edison Co. of New York</u>, 409 F.3d 506, 510 (2d Cir. 2005)); <u>see</u> <u>also</u> <u>Grout Shield Distribs., LLC v. Elio E. Salvo, Inc.</u>, No. 11-CV-3543(JFB)(ARL), 2011 WL 5560296, at *10 (E.D.N.Y. Nov. 16, 2011)

("'Irreparable injury is one that cannot be redressed through a monetary award.  Where money damages are adequate compensation a preliminary injunction should not issue.'") (quoting <u>JSG Trading Corp. v. Tray-Wrap, Inc.</u>, 918 F.2d 75, 79 (2d Cir. 1990)).

Here, Plaintiffs have not argued that MediaNet's alleged unauthorized use of their compositions "negatively affects [Plaintiffs'] reputation[s], business or goodwill, factors routinely considered in evaluating the potential for irreparable harm." <u>Psihoyos v. John Wiley & Sons, Inc.</u>, No. 11 Civ. 1416(JSR), 2011 WL 4634172, at *2 (S.D.N.Y. Oct. 4, 2011).  Instead, Plaintiffs contend that, in the absence of an injunction, they will later be put to "the burden of proving lost sales due to infringement."  (Pltf. Moving Br. 15)  Plaintiffs further argue that "courts recognize that plaintiffs have no adequate remedy at law where infringing activity is likely to continue in the absence of an injunction."  (<u>Id.</u> at 16; <u>see</u> <u>also</u> Pltf. Supp. Br. 5 ("the record before the Court makes plain that in the absence of an injunction MediaNet's repeated acts of infringing distribution of unlicensed work will continue – according to recent New York District Court cases, that is the very definition of irreparable harm. . . .")).

With respect to lost sales or lost profits, as discussed above, Defendants have offered evidence that they track the number of plays of limited downloads and/or streams of Plaintiffs' compositions.  (Mar. 27, 2012 Wallace Decl. ¶¶ 21-22)  The record labels have approved of Defendants' tracking system, and have confirmed its accuracy through random audits.  (<u>Id.</u> ¶ 23)  Given that the record labels' royalty income depends on accurate tracking, they have every incentive to ensure that MediaNet's tracking system is accurate.  Accordingly, their approval of MediaNet's system is significant.  Moreover, Plaintiffs have offered no evidence that MediaNet's tracking system is unreliable.  The Court concludes that the number of unauthorized plays of Plaintiffs' tracks through limited downloads and streaming can be reliably

calculated.  From this data, Plaintiffs can make whatever arguments they wish concerning lost

sales or lost profits.   Accordingly, Plaintiffs have not demonstrated that, absent a preliminary

injunction, they will be subjected to an "'actual and imminent'" injury "'"for which a monetary

award cannot be adequate compensation."'"  Dexter 345 Inc. v. Cuomo, 663 F.3d 59, 63 (2d Cir.

2011) (quoting Tom Doherty Assocs. v. Saban Entm't, Inc., 60 F.3d 27, 37 (2d Cir. 1995)

(quoting Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979))).

   With respect to Plaintiffs' argument that they are entitled to a preliminary

injunction merely because Defendants' "infringing activity is likely to continue in the absence of

an injunction" (Pltf. Moving Br. 13-16), accepting such an argument would render nugatory the

irreparable injury requirement.  Plaintiffs cite no case in which a court has held that a party

seeking a preliminary injunction is excused from demonstrating irreparable injury – meaning

injury that cannot be remedied through monetary compensation – where infringing conduct or

some other unlawful conduct is likely to continue absent a preliminary injunction.

   Plaintiffs' reliance on Marshall v. Marshall, No. 08 CV 1420(LB), 2012 WL

1079550 (E.D.N.Y. Mar. 30, 2012), Granite Music Corp. v. Ctr. St. Smoke House, Inc., 786 F.

Supp. 2d 716 (W.D.N.Y. 2011), and Hounddog Prods., LLC v. Empire Film Group, Inc., 826

F.Supp.2d 619 (S.D.N.Y. 2011) (see Pltf. Moving Br. 13-16, Pltf. Reply Br. 7), is misplaced.  In

each case, the court made a finding that the plaintiff had demonstrated irreparable injury in the

form of harm that could not be adequately compensated through monetary damages.  See

Marshall, 2012 WL 1079550, at *29 (plaintiff "demonstrated that he suffered an irreparable

injury" in the form of lost "video sales, business at his salon, [and] relationships with

magazines"); Granite Music, 786 F. Supp. 2d at 730 (finding that "Plaintiffs will suffer

irreparable injury[] that cannot be compensate[d] solely by monetary damages"); Hounddog

Prods., 826 F.Supp.2d at 626, 632-33 (finding that "Plaintiffs have demonstrated that they have suffered irreparable injury" where defendant failed to meet its contractual marketing and promotion obligations concerning plaintiffs' film, but nonetheless had continued marketing and distributing the film, despite plaintiffs' revocation of distribution rights).

Having determined that the plaintiffs in those actions had proven that they had suffered, and would continue to suffer, irreparable injury, courts went on to consider whether a permanent (as opposed to a preliminary) injunction should issue. See Marshall, 2012 WL 1079550, at *28-29; Granite Music, 786 F. Supp. 2d at 729; Hounddog Prods., 826 F.Supp.2d at 632-33. It was in this context that these courts considered whether, "absent an injunction, the defendant is likely to continue infringing [plaintiffs'] copyrights." Hounddog Prods., 826 F.Supp.2d at 633. The question of continuing infringement is critical in the context of a permanent injunction, because "'[p]ermanent injunctions are appropriate only where . . . there is a substantial likelihood of future infringements.'" Marshall, 2012 WL 1079550, at *29 (quoting Boisson v. Banian, Ltd., 280 F.Supp.2d 10, 19 (E.D.N.Y. 2003)). Nothing in these cases suggests, however, that a plaintiff seeking a preliminary injunction is excused from showing the inadequacy of monetary relief merely because plaintiff has alleged that there is a significant risk of future infringing conduct.

Finally, Plaintiffs' delay in moving for a preliminary injunction weighs against a finding of irreparable harm. Plaintiffs allege that they first became aware of MediaNet's use of the compositions at issue in October 2009. (Apr. 12, 2012 Grauberger Decl. ¶ 7) However, MediaNet began sending NOIs to Plaintiffs as early as 2002 (Apr. 9, 2012 Goldstein Decl. ¶¶ 21-22), and in November 2008, the copyright administrator for all but one of the Plaintiffs acknowledged receipt of the NOIs. (Id. ¶ 22) Even if this Court were to accept Plaintiffs'

argument that the NOIs are facially defective, they appear to have put Plaintiffs on notice – two and a half years before the preliminary injunction motion was filed – that Defendants were using or intending to use Plaintiffs' compositions.[12]  Such a delay in seeking a preliminary injunction weighs against a finding of irreparable harm.  See New Look, 2012 WL 251976, at *10 ("Further weighing against a finding of irreparable harm is plaintiff's delay between the time it discovered [defendant's] use of the design mark – July 1, 2012 – and when it moved for a preliminary injunction – September 8, 2011.  The intervening fourteen months 'suggests that the plaintiff may have acquiesced in the infringing activity or that any harm suffered is not so severe as to be "irreparable."'") (quoting Richard Feiner & Co. v. Turner Entm't Co., 98 F.3d 33, 34 (2d Cir. 1996), abrogated in part by Salinger, 607 F.3d 68); Grout, 2011 WL 5560296, at *11 (where plaintiff waited five months after settlement negotiations between the parties broke down to move for a preliminary injunction, "plaintiff's delay in bringing its preliminary injunction motion was unreasonable and undercut plaintiff's argument that its injury was actual and irreparable"); Wolk v. Kodak Imaging Network, Inc., No. 10 Civ. 4135(RWS), 2011 WL 940056, at * (S.D.N.Y. Mar. 17, 2011) ("Plaintiff's delay in bringing her motion for a preliminary injunction belies her claim of irreparable harm.").

Because Plaintiffs have not demonstrated that they will suffer irreparable harm in the absence of a preliminary injunction, their motion for this relief must be denied.[13]

---

[12]  While Plaintiffs attempt to explain the delay by arguing that they believed MediaNet had removed their compositions from its catalog (see May 7, 2012 Tr. 34), they have repeatedly demonstrated that the presence of their compositions on third-party services associated with MediaNet can be readily detected.

[13]  Having concluded that Plaintiffs have failed to demonstrate irreparable harm, it is unnecessary for this Court to reach the remaining preliminary injunction factors.  See Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 63 (2d Cir. 2007) ("We hold that the district court did not abuse its discretion in finding that [plaintiff] failed to demonstrate sufficiently a likelihood of irreparable harm and, therefore, on that basis alone, affirm its denial of [plaintiff's] motion [for a

## **CONCLUSION**

For the reasons stated above, Plaintiffs' motion for a preliminary injunction is

DENIED.

Dated: New York, New York
       July 6, 2012

                              SO ORDERED.

                              _Paul 2 Dardephe_

                              Paul G. Gardephe
                              United States District Court

---

preliminary injunction]."); see also Linder v. Delles, No. 7:12-CV-00581, 2012 WL 1884649, at
*1 (N.D.N.Y. May 22, 2012) ("Failure to establish 'irreparable harm is alone sufficient for a
court to deny injunctive relief' to the moving party.") (quoting Reuters Ltd. v. United Press Int'l,
Inc., 903 F.2d 904, 907 (2d Cir. 1990)); Life Tech. Corp., 2011 WL 1419612, at *8 ("plaintiffs
have not adequately demonstrated irreparable harm, constituting sufficient grounds for denying
the motion for a preliminary injunction"); Comverse, Inc. v. Am. Telecomm., Inc., No. 06 Civ.
6825(PKL), 2006 WL 3016315, at *6 (S.D.N.Y. Oct. 23, 2006) ("Absent a showing of
imminent, irreparable harm, this Court will not consider the other factors for the issuance of a
preliminary injunction. . . .").